**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
FORT WORTH DIVISION**

| | |
|---|---|
| JAMMIE SMITH, § | |
|     PLAINTIFF, § | |
| § | |
| VS. § | CIVIL ACTION NO. 4:05-CV-639-A |
| § | |
| JO ANNE B. BARNHART, § | |
| COMMISSIONER OF SOCIAL SECURITY, § | |
|     DEFENDANT. § | |

**FINDINGS, CONCLUSIONS AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE
AND
NOTICE AND ORDER**

This case was referred to the United States Magistrate Judge pursuant to the provisions of Title 28, United States Code, Section 636(b). The Findings, Conclusions and Recommendation of the United States Magistrate Judge are as follows:

FINDINGS AND CONCLUSIONS

A.   STATEMENT OF THE CASE

Plaintiff Jammie Smith brings this action pursuant to Sections 405(g) and 1383(c)(3) of Title 42 of the United States Code for judicial review of a final decision of the Commissioner of Social Security denying his claim for disability benefits under Title II and supplemental security income or SSI benefits under Title XVI of the Social Security Act.

Smith applied for disability insurance and SSI benefits on July 23, 2001, with an alleged disability onset date of March 30, 2001. (Tr. 329, 337). The Social Security Administration denied Smith's application for benefits both initially and on reconsideration, and Smith requested a hearing

before an administrative law judge (the "ALJ"). ALJ Herbert J. Green held a hearing on March 12, 2003 in Fort Worth, Texas. (Tr. 35-73). Smith was represented by counsel during the hearing. On May 9, 2003, the ALJ issued a decision that Smith was not disabled and was not entitled to disability or SSI benefits because he retained the capacity to perform work available in significant numbers in the national economy. (Tr. 15-24). The Appeals Council denied Smith's request for review of his case, leaving the ALJ's decision to stand as the final decision of the Commissioner. (Tr. 4).

B.  STANDARD OF REVIEW

The Social Security Act defines a disability as a medically determinable physical or mental impairment lasting at least twelve months that prevents the claimant from engaging in substantial gainful activity. 42 U.S.C. § 423(d), 1382c(a)(3)(A); *McQueen v. Apfel*, 168 F.3d 152, 154 (5th Cir. 1999). To determine whether a claimant is disabled, and thus entitled to disability benefits, a five-step analysis is employed. 20 C.F.R. §§ 404.1520, 416.920. First, the claimant must not be presently working at any substantial gainful activity. Substantial gainful activity is defined as work activity involving the use of significant physical or mental abilities for pay or profit. 20 C.F.R. §§ 404.1527, 416.972. Second, the claimant must have an impairment or combination of impairments that is severe. An impairment or combination of impairments is not severe if it has such minimal effect on the individual that it would not be expected to interfere with the individual's ability to work. 20 C.F.R. §§ 404.1520(c), 416.920(c); *Stone v. Heckler*, 752 F.2d 1099, 1101 (5th Cir. 1985), *cited in Loza v. Apfel*, 219 F.3d 378, 392 (5th Cir. 2000). At the third step, disability will be found if the claimant's impairment or combination of impairments meets or equals an impairment listed in the appendix to the regulations. *Id.* §§ 404.1520(d), 416.920(d). Fourth, if disability cannot be found

on the basis of the claimant's medical status alone, the impairment or impairments must prevent the claimant from returning to his past relevant work. *Id.* §§ 404.1520(e), 416.920(e). And fifth, the impairment must prevent the claimant from doing any work, considering the claimant's residual functional capacity, age, education, and past work experience. *Id.* §§ 404.1520(f), 416.920(f); *Crowley v. Apfel,* 197 F.3d 194, 197-98 (5th Cir.1999).

At steps one through four, the burden of proof rests upon the claimant to show he is disabled. If the claimant satisfies this responsibility, the burden shifts to the Commissioner at step five of the process to show that there is other gainful employment the claimant is capable of performing in spite of his existing impairments. *Crowley*, 197 F.3d at 198. If the Commissioner meets this burden, the claimant must then prove that he cannot in fact perform the work suggested. *Waters v. Barnhart*, 276 F.3d 716, 718 (5th Cir. 2002). A finding at any point in the five-step process that a claimant is disabled or not disabled is conclusive and terminates the analysis. *Masterson v. Barnhart*, 309 F.3d 267, 272 (5th Cir. 2002).

A denial of disability benefits is reviewed only to determine whether the Commissioner applied the correct legal standards and whether the decision is supported by substantial evidence in the record as a whole. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995); *Hollis v. Bowen*, 837 F.2d 1378, 1382 (5th Cir. 1988). Substantial evidence is such relevant evidence as a responsible mind might accept to support a conclusion. *Boyd v. Apfel*, 239 F.3d 698, 704 (5th Cir. 2001). It is more than a mere scintilla, but less than a preponderance. *Id*. A finding of no substantial evidence is appropriate only if no credible evidentiary choices or medical findings support the decision. *Id.* This Court may neither reweigh the evidence in the record nor substitute its judgment for the

**Findings, Conclusions and Recommendation
of the United States Magistrate Judge– Page 3 of 19**

Commissioner's, but will carefully scrutinize the record to determine if the evidence is present. *Harris v. Apfel*, 209 F.3d 413, 417 (5th Cir.2000); *Hollis*, 837 F.2d at 1383.

C. ISSUES

    1. Whether substantial evidence supports the residual functional capacity assessment;

    2. Whether the ALJ gave appropriate weight to a treating source opinion and other medical opinions in the record;

    3. Whether there is substantial evidence to support the ALJ's determination that Smith was capable of performing other work available in significant numbers in the national economy.

D. ADMINISTRATIVE RECORD

    1. Treatment History

The administrative record provides the following information about Smith's condition:

Smith was hit with a baseball bat on March 29, 2001, which caused complete and permanent loss of vision in his right eye. (Tr. 104-08, 116-18, 130). Smith moved in with his mother after his injury, and it was his mother who suggested that he seek psychiatric treatment. (Tr. 57).

Smith completed the intake assessment forms for services at Tarrant County Mental Health and Mental Retardation (MHMR) in February 2002. He reported being isolated with increased sleep, decreased energy, decreased motivation, increased anxiety, decreased appetite, and increased irritability. (Tr. 152). He also reported symptoms of an obsessive-compulsive disorder (OCD). Smith said he had been hospitalized when he was twelve for an oppositional disorder and described intermittent periods of depression thereafter. (Tr. 150, 152). He stated that his depression had worsened after his eye injury. (Tr. 150). Although an MHMR staff member assessed a possible

**Findings, Conclusions and Recommendation**
**of the United States Magistrate Judge– Page 4 of 19**

bipolar disorder, (Tr. 151), that diagnosis was not confirmed by Smith's treating psychiatrist, Chandrakant Patel, M.D.

Smith underwent a consultative psychiatric evaluation with Murray Skaggs, M.D., on December 17, 2001. (Tr. 134). Smith complained of chronic depression since losing the sight in his right eye. He reported sleeping more, decreased energy, and decreased motivation. He had some thoughts of suicides, but had made no suicide attempts. (Tr. 134). Smith also reported having anxiety attacks since he was twenty years old. The attacks caused shortness of breath, a "funny feeling", and the fear that he was going to die, and often occurred when he was in a crowd. He had no current medications other than aspirin, and denied drinking alcohol for the past two months. He admitted smoking cigarettes daily and marijuana occasionally, but denied using any other drugs. (Tr. 134). He had not worked since his eye injury. Smith said that he spent most of the day sleeping and watched television all night. He rarely left home except to visit family members, and had no friends. His only hobby was writing poetry. (Tr. 135). Smith's speech was goal-directed and easily to follow. He exhibited an anxious mood and affect throughout the interview. (Tr. 135).

Smith was able to perform serial 7s, repeat seven digits forward and four digits in reverse order, and perform simple mathematic calculations. He also demonstrated good memory skills. Skaggs assessed a major depressive disorder, panic attacks with agoraphobia, alcohol dependency in remission, and an unspecified personality disorder. Skaggs assessed a current Global Assessment of Functioning (GAF) score of 49.[1] (Tr. 135).

---

[1] A GAF score is a standard measurement of an individual's overall functioning level with respect to psychological, social, and occupational functioning. AMERICAN PSYCHIATRIC ASSOCIATION, DIAGNOSTIC AND STATISTICAL MANUAL OF MENTAL DISORDERS 32 (4th ed. 1994). A GAF score of 41 to 50 indicates serious

**Findings, Conclusions and Recommendation
of the United States Magistrate Judge– Page 5 of 19**

An ophthalmological evaluation in March 2002 confirmed 20/20 vision in Smith's left eye, but he had no light perception in his right eye. (Tr. 137). The examining physician opined that there was no hope for improvement given the injury Smith had sustained. (Tr. 138).

Smith had another MHMR appointment on March 22, 2002, and was given a prescription for Zoloft. (Tr. 147). On evaluation, he was cooperative, but his mood was considered depressed. The clinic nurse assessed his judgment as intact, his insight was fair, and he demonstrated no attention or memory problems. (Tr. 148). His diagnoses included major depression disorder, moderate, recurrent, without psychotic features; polysubstance dependence in remission; and possible OCD. His current GAF score was listed as 38.[2] (Tr. 147).

Smith underwent a consultative psychiatric evaluation with Tara Reddy, M.D., on April 5, 2002. (Tr. 139). Smith reported a lengthy psychiatric history beginning at age twelve. He remained depressed and anxious, and stated that he had tried various psychiatric medications without relief. He was currently taking Zoloft as prescribed by his treating physician at MHMR, but he did not think that the medication was helpful. He reported feeling sad, isolating himself, crying spells, and oversleeping. (Tr. 139). He was eating too much and had gained seventy pounds in a year. He also reported panic attacks three or four times a week, especially when he was in a crowd. (Tr. 139). Smith lived with his mother. Smith said that he generally got up around 9 p.m. and went to bed

---

symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job). DSM-IV at 34.

[2] A GAF score of 31-40 reflects some impairment in reality testing or communication (e.g., speech that is at times illogical, obscure, or irrelevant) or major impairment in several areas, such as work or school, family relations, judgment, thinking, or mood. *See id.*

**Findings, Conclusions and Recommendation**
**of the United States Magistrate Judge– Page 6 of 19**

between 6:30 and 8:00 a.m. He did the laundry and handled his own mail, but his mother did the cooking, cleaning, driving, and shopping. (Tr. 139). Smith admitted that he had been an alcoholic for many years. (Tr. 140).

Smith was cooperative and made good eye contact during the interview. His speech was coherent and relevant, and he denied any auditory or visual hallucinations. (Tr. 140). Reddy described his mood as dysphoric and anxious, with an appropriate affect. Reddy found that Smith had good remote and recent memory and excellent immediate recall. His concentration was intact, and he demonstrated the ability for abstract thinking. Judgment and impulse control were intact, his insight was good, and his intelligence was considered average. Reddy found that Smith's pace and persistence were slow, and noted considerable deterioration in his condition during the past year. (Tr. 140). Reddy diagnosed major depression, panic disorder with agoraphobia, and polysubstance dependence in early remission. (Tr. 140-41). Reddy assessed a current GAF score of 52,[3] and gave Smith a guarded prognosis. (Tr. 141).

During a follow-up appointment at MHMR on April 15, 2002, Smith complained that Zoloft made him feel weird and irritable. (Tr. 143). He reported no change in his symptoms after he stopped taking Zoloft. Smith's counselor noted that his obsessive-compulsive symptoms were causing him distress. Smith also complained of not sleeping well and reported that he would be testifying soon against the man who put his eye out. New medications were prescribed. (Tr. 143).

Smith returned to the clinic on May 31, 2002. Smith was feeling depressed and anxious.

---

[3] A GAF score of 51 to 60 reflects moderate symptoms or moderate impairment in functioning. DSM-IV at 34.

**Findings, Conclusions and Recommendation
of the United States Magistrate Judge– Page 7 of 19**

He was given a new prescription for Effexor. (Tr. 205). On August 30, 2002, Smith said he was doing better, but reported one episode of racing thoughts. His sleep habits and appetite were okay, and he was getting out of the house and doing things with his family. (Tr. 201). In September 2002, Smith reported doing better, but was still having trouble with OCD. (Tr. 200). His medication was increased. (Tr. 200).

Smith saw Patel again on December 13, 2002. He said that he was doing okay and tolerating his medications, but he could not handle stress or work. He had recently traveled to Kansas to see his sister. He was instructed to continue taking his current medications as prescribed. (Tr. 310).

Patel completed a medical source statement dated December 13, 2002. He opined that Smith's mental impairment seriously interfered with his ability to understand and carry-out detailed instructions; maintain attention and concentration for extended periods; perform activities within a schedule, maintain regular attendance, and be punctual; sustain an ordinary routine without special supervision; work in coordination with or proximity to others without being unduly distracted; and complete a normal work week without interruptions from psychological symptoms and perform at a consistent pace without an unreasonable number and length of rest periods; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in work setting. (Tr. 209-10). Patel found Smith suffered from extreme loss in ability to cope with normal work stresses without exacerbating psychologically based symptoms. (Tr. 210). Patel found Smith was generally capable of applying commonsense understanding to carry out instructions and deal with problems that involved several concrete variables in or from standardized situations; carrying out very short and simple instructions; interacting appropriately with the general public; asking for

assistance; and getting along with coworkers or peers. (Tr. 209-10). Patel explained that his assessment was based on Smith's depression, nervousness, anxiety, decreased concentration, and obsessive thoughts. (Tr. 210).

Smith was seen at the MHMR clinic on January 24, 2003. He reported that he was doing well on his present medications and described his OCD as "a little better." (Tr. 250).

2.   Administrative Hearing

Smith testified that he was born August 18, 1974. (Tr. 39). He completed high school and had worked as a fast-food server, a construction laborer, a warehouseman, a stamping machine operator, a telemarketer, a convenience store clerk, and a dishwasher. (Tr. 39-40, 84). He had not kept any of his jobs for an extended period of time, and he testified that he had been unable to work since March 2001 because he felt depressed and suicidal. (Tr. 40).

Smith lived with his mother. He helped her clean the house, watched television, and occasionally visited family members. (Tr. 42-43). Smith acknowledged having a criminal history and substance abuse problems, but testified that he had quit drinking about a month before the hearing and rarely smoked marijuana. (Tr. 44). Smith testified that he had grown up with an abusive father and had attended schools designed for children with problems. He had also been placed in a psychiatric hospital for several weeks as a child because of problems he was causing for his family. (Tr. 45-46). Smith testified that he thought his later problems with drugs and alcohol were a way to self-medicate himself. (Tr. 46).

Smith testified that he slept most of the day and stayed up at night to avoid interacting with others. (Tr. 47). He also testified that he had several obsessive-compulsive traits, such as checking

**Findings, Conclusions and Recommendation**
**of the United States Magistrate Judge– Page 9 of 19**

and rechecking the door locks or cleaning things repeatedly. (Tr. 47). Sometimes his obsessive-compulsive behavior had caused him to miss work or be late for appointments. (Tr. 47, 52). Smith saw Patel and the nurses at MHMR on a regular basis for counseling and medication, and Smith thought his medications helped him feel more sociable and less agitated. (Tr. 48, 51). Smith complained that he still had panic attacks when he was in a crowded environment. (Tr. 51-52). He was also sensitive about his appearance and wore dark glasses to conceal his eye injury. (Tr. 54).

Smith's mother, Tena Ward, testified that her son's obsessive behavior had begun when he was a child. When Smith initially moved back to his mother's home, he rarely left his room because he was devastated and depressed by his injury, which prompted Ward to request that her son seek professional mental health treatment. (Tr. 57). Although medications had proved helpful with some of Smith's behavior, Ward did not think he was ready to return to work. (Tr. 58).

Medical expert Ann Turbeville also testified. She noted that Smith had a history of attention deficit and oppositional defiant disorder, antisocial-type behaviors, and substance abuse problems. (Tr. 59-60). Although Smith had an early diagnosis of bipolar disorder, Turbeville did not see classic evidence of a bipolar illness in his records. Although Smith had some severe mental impairments, Turbeville did not find that any of the impairments met or equaled a listed impairment. Turbeville testified that Smith's non-exertional physical impairments included a lack of depth perception that would preclude him from working around dangerous machinery. Turbeville also testified that Smith had marked difficulty with social situations, impulse control, frustration tolerance, and anger, and accordingly, she opined that he should be limited to superficial interaction with the public and coworkers. Turbeville would also restrict Smith to simple, repetitive instructions

to minimize the potential for criticism from supervisors. (Tr. 61, 64).

The ALJ also arranged for vocational expert Donna Humphries to testify. The ALJ asked Humphries to consider an individual of Smith's age, education, and work history who had no exertional limitations but

> also the individual has no right eye and he cannot [sic] work involving, jobs involving depth perception or at heights or around dangerous machinery. Consider also the individual cannot work with the general public, can only have superficial contact with coworkers and supervisors and he's limited to simple work. Are there any jobs in the national economy such an individual can perform?

(Tr. 66-67). Humphries testified that there were unskilled jobs as a laundry worker (with approximately 90,000 jobs nationwide), janitorial worker (with approximately 400,000 jobs nationwide), or garment-sorter (with approximately 40,000 jobs nationwide). (Tr. 67).

3.   ALJ Decision

The ALJ found that Smith had not engaged in substantial gainful activity since March 30, 2001 and suffered from a loss of vision in his right eye; depression; a personality disorder; a history of substance abuse; and panic attacks. The ALJ, however, found that Smith had no impairments or combination of impairments meeting or equaling in severity any listed impairment. (Tr. 16). Proceeding with the sequential evaluation process, the ALJ determined that Smith retained the ability to perform simple work at all exertional levels if the work did not require the use of the right eye or depth perception; did not require work around dangerous machines; did not require interaction with the general public; and required no more than superficial interaction with coworkers and supervisors. (Tr. 22). The ALJ found that Smith was unable to perform his past relevant work, but based on the vocation expert's testimony, the ALJ found a significant number of jobs that Smith

could perform existed in the national economy. (Tr. 23). Accordingly, the ALJ concluded that Smith was not disabled and was not eligible for disability insurance or SSI benefits. (Tr. 24).

    4.    Appeals Council Evidence

In support of his request for review, Smith submitted an updated psychiatric evaluation report from Murray Skaggs, M.D. Skaggs performed a second consultative evaluation on December 12, 2003. (Tr. 325). Smith drove himself to the interview. He complained of multiple problems, including depression, feelings of worthlessness, increased sleep and appetite. He denied experiencing hallucinations, delusions, or suicidal thoughts. Smith reported panic attacks and intrusive thoughts and preoccupations with safety that caused him to check and recheck door locks, turn the house lights off and on repeatedly, and repeat the same word or phrase over and over to relieve feelings of anxiety. Smith also described periods of irritability and edginess that occurred even when he was not depressed. (Tr. 325). His current medications included Paxil and Elavil.

Smith lived with his mother. (Tr. 326). He arose around 1:00 p.m. each day and watched television throughout the day. He helped his mother with some of the housework, but was unable to do too much because of back pain and shortness of breath. He rarely left home unless he had an MHMR appointment. (Tr. 326). He reported having no close friends.

Skaggs described Smith as a moderately obese individual. Smith was casually dressed, and he wore sunglasses during the interview. His mood and affect were assessed as moderately depressed. He was able to perform serial 7s and simple arithmetic, interpret proverbs, and recall two out of three items after a five-minute delay. (Tr. 326). Skaggs diagnosed major depression, panic attacks with agoraphobia, and OCD. Skaggs assessed a current GAF score of 49, and deferred to

Smith's treating psychiatrist with respect to Smith's prognosis. (Tr. 327).

D.   DISCUSSION

Smith asserts that the Commissioner has failed to follow her own rules in assessing his residual functional capacity (RFC), and that substantial evidence does not support the mental limitations as found by the ALJ. In particular, Smith asserts that the ALJ erred in assigning more weight to the testifying medical expert's opinions than the opinions of treating psychiatrist Patel.

Adjudicators must carefully consider every medical opinion received. SOCIAL SECURITY RULING 96-5p. When a treating physician provides a medical opinion that is well-supported by medically acceptable clinical or laboratory diagnostic techniques and is not inconsistent with other substantial evidence of record, it is entitled to controlling weight. 20 C.F.R. § 404.1527(d)(2), 416.927(d)(2). Even if a treating source opinion is not entitled to controlling weight under the regulations, that does not mean the opinion should be completely rejected. In many cases, the opinion may be entitled to the greatest weight and should be adopted even if it does not satisfy the test for controlling weight. SOCIAL SECURITY RULING 96-2p.

The ALJ can decrease the weight assigned to a medical opinion for good cause, which includes disregarding statements that are brief and conclusory, unsupported by acceptable diagnostic techniques, or otherwise unsupported by the evidence. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995). But before rejecting a treating source opinion, the ALJ must consider the factors outlined in the administrative regulations, which include: the length of the treatment relationship, frequency of examination, nature and extent of the treating relationship, evidence supporting the opinions, the consistency of those opinions, and medical specialization. *See* 20 C.F.R. §§ 404.1527(d),

**Findings, Conclusions and Recommendation**
**of the United States Magistrate Judge– Page 13 of 19**

416.927(d); *Newton v. Apfel*, 209 F.3d 448, 456 (5th Cir. 2000). *See also* SOCIAL SECURITY RULING 96-5p, 96-2p. The determination of disability, however, always remains the province of the ALJ. *See id.* §§ 404.1527(e), 416.927(e).

Smith contends that the ALJ should have adopted the medical source statement that Patel submitted, which reflected that Smith was unable to perform basic work-related mental activities. Smith complains that the ALJ did not weight Patel's opinion in accordance with the regulations or the Fifth Circuit's holding in *Newton* before declining to assign controlling weight to the opinion, and further complains that the ALJ likewise failed to consider the appropriate factors before adopting medical expert testimony that contradicted Patel's assessment.

The ALJ considered Patel's medical source statement, but found that Patel and the MHMR counseling staff had consistently over-reported the severity of Smith's symptoms when compared to the objective signs of mental illness that were documented in the record. (Tr. 19). The ALJ found that Smith's actual mental functioning when examined by the two consultative psychiatrists and MHMR staff demonstrated that Smith was exaggerating his subjective complaints, although the ALJ conceded that Smith may have been severely depressed for several months following the loss of vision in his right eye. (Tr. 19). In reviewing Patel's report, the ALJ noted that Smith's MHMR visit just one month after that report indicated that he was doing well, had no problems with sleep or appetite, had experienced some improvement in his obsessive-compulsive behavior, was calm and cooperative, was well-groomed, exhibited normal mood and speech, and demonstrated intact thought processes. (Tr. 19-20). The ALJ found that the record, viewed as a whole, contradicted the severity of the psychiatric symptoms as assessed by Patel and other MHMR personnel. Accordingly, the

**Findings, Conclusions and Recommendation
of the United States Magistrate Judge– Page 14 of 19**

ALJ declined to assign controlling weight to Patel's opinions about Smith's ability to engage in sustained work activity.[4] (Tr. 20). Instead, the ALJ adopted the testimony of the medical expert, a specialist in psychiatry, with respect to the severity of Smith's mental impairments and the work-related limitations that Smith's impairments would impose. (Tr. 20, 22). Although Smith might prefer more specificity in the administrative decision, the ALJ's decision reflects that he considered the relevant factors outlined in the administrative regulations and complied with the Fifth Circuit's decision in *Newton*.

Smith also contends that the ALJ did not comply with the administrative regulations that require the adjudicator to discuss the evidence and how it supports the RFC determination. RFC is what an individual can still do despite his limitations. 20 C.F.R. § 404.1545, 416.945; SOCIAL SECURITY RULING 96-8p. It reflects the individual's maximum remaining ability to do sustained work activity in an ordinary work setting on a regular and continuing basis. SOCIAL SECURITY RULING 96-8p; *Myers v. Apfel*, 238 F.3d 617, 620 (5th Cir. 2001). The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts and non-medical evidence. *Id*. The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved. *Id*.

A review of the ALJ's decision establishes that he sufficiently outlined the reasons underlying his RFC assessment. The ALJ noted the minimal to moderate objective findings reported during Smith's various consultative evaluations and examinations by MHMR staff, which

---

[4] The ALJ also noted that Patel opined that Smith had had these limitations since March 11, 2001 even though Patel first saw Smith in 2002. (Tr. 19).

**Findings, Conclusions and Recommendation
of the United States Magistrate Judge– Page 15 of 19**

contradicted the severity of Smith's subjective complaints. (Tr. 19-22). In addition, the ALJ noted that Smith's condition improved with treatment. (Tr. 22). The ALJ did not deny that Smith's mental impairments imposed some limitations, especially with respect to his ability to handle frustration and get along with other people, but found that Smith's mental impairments were not so severe as to preclude him from functioning in any work setting. (Tr. 20). The ALJ accepted the medical expert's opinion that Smith could perform simple work that accommodated his vision problems and required no more than superficial contact with others. (Tr. 22). The ALJ gave an adequate narrative explanation at each step of the sequential evaluation process, including the assessment of Smith's RFC.

Smith also complains of the ALJ's failure to expressly discuss the credibility of the testimony that Smith's mother gave during the hearing. The Fifth Circuit has declined to prescribe any rigid or set formula for the ALJ to follow when articulating the reasons underlying his decision on disability. *See Falco v. Shalala*, 27 F.3d 160, 163 (5th Cir. 1994). The ALJ outlined the testimony that Smith and his mother gave during the hearing, then explained why Smith's various subjective complaints, which Ward corroborated during her testimony, were inconsistent with other evidence. Although Smith might prefer that the ALJ specifically identify the weight or credibility assigned to Ward's testimony, the ALJ's decision reflects that he considered the testimony that Ward presented during the hearing, which is all that is required. *See* SOCIAL SECURITY RULING 96-7p (addressing the evaluation of a claimant's credibility).

Smith also contends that the substantial evidence does not support a finding that there is other work available in significant numbers in the national economy. Smith argues that the

**Findings, Conclusions and Recommendation
of the United States Magistrate Judge– Page 16 of 19**

hypothetical presented to the vocational expert was deficient because it did not reflect the limitations contained in Patel's medical source statement, and accordingly, this deficiency renders the vocational expert's testimony unreliable.

The hypothetical presented to the vocational expert must reasonably incorporate all of the disabilities recognized by the ALJ's residual functional capacity assessment, and the claimant or his representative must be afforded the opportunity to correct any deficiencies in the ALJ's question. *Bowling v. Shalala*, 36 F.3d 431, 436 (5th Cir. 1994). A claimant's failure to point out problems in a defective hypothetical does not salvage that hypothetical as a proper basis for a disability determination. *Boyd v. Apfel*, 239 F.3d 698, 707 (5th Cir. 2001). However, Smith cites no authority that would require the ALJ to incorporate limitations he has not found to exist.

The ALJ considered Patel's opinion, but the ALJ did not agree with Patel's opinion and found that the opinion was not entitled to controlling weight in light of the other evidence of record. The ALJ was not required to incorporate Patel's opinion when forming a hypothetical for the vocational expert's consideration. Instead, the ALJ found Smith required simple work that did not require Smith to use his right eye or work around dangerous machinery, interact with the general public, or have more than superficial interaction with coworkers or supervisors. When presented with these work-related limitations, the vocational expert identified three suitable unskilled jobs available in the national economy in significant numbers. The ALJ's determination at Step Five of the sequential evaluation process is supported by substantial evidence and has not been shown to be a product of legal error.

RECOMMENDATION

It is recommended that the Commissioner's decision be affirmed.

NOTICE OF RIGHT TO OBJECT TO PROPOSED
FINDINGS, CONCLUSIONS AND RECOMMENDATION
AND CONSEQUENCES OF FAILURE TO OBJECT

Under 28 U.S.C. § 636(b)(1), each party to this action has the right to serve and file specific written objections in the United States District Court to the United States Magistrate Judge's proposed findings, conclusions and recommendation within ten (10) days after the party has been served with a copy of this document. The court is hereby extending the deadline within which to file specific written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation until January 2, 2007. The United States District Judge need only make a *de novo* determination of those portions of the United States Magistrate Judge's proposed findings, conclusions and recommendation to which specific objection is timely made. *See* 28 U.S.C. § 636(b)(1). Failure to file by the date stated above a specific written objection to a proposed factual finding or legal conclusion will bar a party, except upon grounds of plain error or manifest injustice, from attacking on appeal any such proposed factual findings and legal conclusions accepted by the United States District Judge. *See Douglass v. United Services Auto Ass'n*, 79 F.3d 1415, 1428-29 (5th Cir. 1996)(en banc).

ORDER

Under 28 U.S.C. § 636, it is hereby ORDERED that each party is granted until January 2, 2007 to serve and file written objections to the United States Magistrate Judge's proposed findings, conclusions and recommendation. It is further ORDERED that if objections are filed and the

opposing party chooses to file a response, the response shall be filed within seven (7) days of the filing date of the objections.

It is further ORDERED that the above-styled and numbered action, previously referred to the United States Magistrate Judge for findings, conclusions and recommendation, be and hereby is returned to the docket of the United States District Judge.

SIGNED DECEMBER 11, 2006.

　　　/s/   Charles Bleil
CHARLES BLEIL
UNITED STATES MAGISTRATE JUDGE

**Findings, Conclusions and Recommendation
of the United States Magistrate Judge– Page 19 of 19**